# 14-2550

## In the
## United States Court of Appeals
### For the Second Circuit

AUTHORS GUILD, INC.,

*Plaintiff-Appellee,*

v.

EMILY M. BASS, Previously Served As Class Counsel,

*Appellant,*

REED ELSEVIER, DOW JONES REUTERS BUSINESS
INTERACTIVE, LLC, DBA FACTIVA, DIALOG CORPORATION,
THOMSON CORPORATION, GALE GROUP INC, WEST
PUBLISHING COMPANY, PROQUEST LLC, NEWSBANK, INC.,
NEW YORK TIMES COMPANY, UNION-TRIBUNE PUBLISHING
COMPANY, KNIGHT-RIDDER, INC., MEDIASTREAM, INC., DOW
JONES & COMPANY INC., EBSCO INDUSTRIES, INC.,
and KNIGHT RIDER DIGITAL,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR APPELLANT

LAW OFFICES OF EMILY M. BASS
*Appellant, Pro-Se*
551 5th Avenue, 28th Floor
New York, New York 10176
(212) 260-3645

# TABLE OF CONTENTS

**Pages**

JURISDICTIONAL STATEMENT ................................................................. 1

ISSUES PRESENTED FOR REVIEW ........................................................ 2

STATEMENT OF THE CASE .................................................................... 4

SUMMARY OF ARGUMENT .................................................................. 16

ARGUMENT ............................................................................................. 17

Preliminary Note on Standard of Review ..................................................... 17

I. The District Court Abused Its Discretion In Denying NLC
   Compensation For Tasini Work That Unquestionably
   Benefited The Class ............................................................................... 18

    A. The District Court Erred In Concluding That Contributions
   Made In Another Case Could Not Be Compensated In This One 19

    B. It Further Erred In Concluding That The Only Tasini Phase That
   Was Relevant To The MDL Was The One In The Supreme
   Court Phase .......................................................................................... 20

    C. The District Court's Finding That NLC Did Not Participate In
   The Supreme Court Phase Was Clearly Erroneous ................. 22

II. The District Court Erred In Thereafter Ceding Private Counsel
   Authority Over Fees. It Was Required In This Non-PSLRA
   Case To Make Fee Determinations Itself ......................................... 23

III. The District Court Erred In Conferring Greater Powers On
   A/BC In This Case Than Are Possessed By A U.S. Magistrate ........ 27

i

IV. The District Court Erred In Permitting Lead Counsel To
Allocate Fees Commensurate With Hours Worked Rather
Than Contributions Made .................................................................. 28

    A. The Goldberger Factors Do Not Support A/BC's
    Fee Request ............................................................................ 32

V. The District Court Erred In Permitting Lead Counsel To
Determine NLC's Allocation Based Upon A Fee-Sharing Agreement
To Which She Was Not A Party And That Had
Not Been Timely Disclosed ................................................................ 39

    A. The Court Erred In Permitting The F/SA To Be
    Applied To NLC ..................................................................... 41

    B. By Permitting A/BC To Utilize F/SA's Allocation
    Formula To Determine How Much NLC Would Be Paid,
    The Court Violated Due Process ........................................... 42

VI. Even If It Were Not Improper For A/BC To Have Utilized
A Lodestar-Comparison Formula To Determine NLC's
Allocation, The District Court Erred In Permitting A/BC
To Use Invalid Lodestars ................................................................... 44

    A. A/BC Included Hours In Their Own Lodestars That
    Could Not Properly Be Included ........................................... 45

        1. Time Block #1: A/B Counsel's Appellate Work
        on the Question Of Whether the First Settlement
        Was Fair, Reasonable And Adequate ........................... 45

        2. Time Block #2: A/B Counsel's Phase I Work
        Related to The First Round of Mediation ...................... 46

        3. Time Block #3: A/BC's Appellate Time on the
        Jurisdictional Issue ....................................................... 48

B. A/BC Excluded Hours from NLC's Lodestar That Should
Have Been Included ................................................. 49

C. A/BC's Hourly Rates Were Unreasonable, Especially
Under The Circumstances Of This Case ................................. 49

VII. Regardless Of Whether It Was Appropriate To Use An
"Hours-Worked" Or "Contributions-Made" Formula To
Determine NLC's Allocation, The District Court Erred In
Not Requiring Counsel To Produce Their Contemporaneous
Time Records ..................................................................... 53

VIII. The District Court Erred In Overruling The Preceding Objections
On That Ground That NLC Lacked Standing
To Make Them ..................................................................... 56

CONCLUSION ............................................................. 59

# TABLE OF AUTHORITIES

Page

## Cases:

*Bebchick v. Washington Metropolitan Area Transit Commission,*
    805 F.2d 396 (D.C. Cir. 1986) .......................................................... 19

*Bein v. Heath,*
    47 U.S. 228 (1848) ............................................................................ 20

*Blanchard v. Bergeron,*
    489 U.S. 87 (1989) ...................................................................... 28-29

*Blau v. Rayette-Faberge, Inc.,*
    389 F.2d 469 (2d Cir. 1968) ............................................................. 30

*Broad. Music, Inc. v. PAMDH Enters.,*
    2014 U.S. Dist. LEXIS 84409 (S.D.N.Y. 2014) ............................... 50

*Cablevision Sys. N.Y. City Corp. v. Diaz,*
    2002 U.S. Dist. LEXIS 12759 (S.D.N.Y. July 10, 2002) ................. 53

*Carroll v. Blinken,*
    105 F.3d 79 (2d Cir. 1997) ............................................................... 28

*County of Suffolk v. Long Island Lighting Co.,*
    907 F.2d 1295 (2d Cir. 1990) ........................................................... 19

*Cowdrey v. Galveston, Houston and Henderson R.R. Co.,*
    93 U.S. 352 (1876) ........................................................................... 19

*Davis v. Eastman Kodak Co.,*
    758 F.Supp. 2d 190 (WDNY 2010) .................................................. 50

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002) ............................................................................. 57

*DiFillippo v. Morizio,*
    759 F.2d 231 (2d Cir. 1985) ............................................................. 33

*Doherty v. Bress*,
    262 F.2d 20 (D.C. Cir. 1958), *cert. den'd*, 359 U.S. 934 (1959) ....... 19

*Dubin v. E.F. Hutton Group Inc.*,
    845 F.Supp. 1004 (S.D.N.Y. 1994)
    *aff'd as modified*, 878 F.Supp. 616 (S.D.N.Y. 1995)......................... 19

*Gilson v. Chock Full O'Nuts Corp.*,
    331 F.2d 107 (2d Cir. 1964) .............................................................. 30

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ...........................................................*Passim*

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ............................................................. 19

*GulfStream III Associates, Inc. v. GulfStream Aerospace Corp.*,
    995 F.2d 414 (3d Cir. 1993) .............................................................. 19

*In re "Agent Orange" Prod. Liability Litig.*,
    818 F.2d 226 (2d Cir. 1987) ........................................................*Passim*

*In re AT&T Corp. Secs. Litig.*,
    455 F.3d 160 (3d Cir. 2006) .............................................................. 30

*In re Cendant Corp. Sec. Litig.*,
    404 F. 3d 173 (3d Cir. 2005) .......................................................*Passim*

*In re Flonase Antitrust Litig.*,
    951 F.Supp. 2d 739 (E.D.Pa. 2013)............................................. 30-31

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ................................................................ 30

*In re Initial Public Offering Securities Litigation*,
    Case No. 21 MC 92 (SAS), 2011 WL 2732563
    (S.D.N.Y. July 8, 2011) ..................................................................... 23

*In re Linerboard Antitrust Litigation*,
　　292 F.Supp. 2d 644 (E.D. Pa. 2003).................................... 19

*In re Nineteen Appeals Arising out of San Juan Dupont Plaza*
　　*Hotel Fire Litig.*,
　　982 F.2d 603 (1st Cir. 1992) ......................................... 55, 57

*J & J Sports Prods. v. Garcia*,
　　2011 U.S. Dist. LEXIS 29262 (S.D.N.Y. March 1, 2011)................ 53

*Klawock v. Gustafson*,
　　585 F.2d 428 (9th Cir. 1978) .............................................. 19

*Koon v. United States*,
　　518 U.S. 81 (1996) ......................................................... 17

*LeBlanc-Sternberg v. Fletcher*,
　　143 F.3d 748 (2d Cir. 1997) ............................................... 29

*Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*,
　　654 F.3d 242 (2d Cir. 2011) .......................................*Passim*

*Luca v. County of Nassau*,
　　344 Fed. Appx. 637 (2d Cir. 2009) ...................................... 50

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992) ........................................................ 56

*Lunday v. City of Albany*,
　　42 F.3d 131(2d Cir. 1994) ........................................... 29, 53

*McDaniel v. County of Schenectady*,
　　595 F.3d 411 (2d Cir. 2010) ..................................... 33, 50, 58

*Microsoft Corp. v. Computer Care Ctr., Inc.*,
　　2008 U.S. Dist. LEXIS 112080 (E.D.N.Y. 2008) ............................ 51

*Milliron v. T-Mobile United States*,
　　423 Fed. Appx. 131 (3d Cir. 2011) ............................... 19, 29

*Motorola, Inc. v. Abeckaser*,
    2009 U.S. Dist. LEXIS 87803, 2009 WL 2568529
    (E.D.N.Y. Aug. 5, 2009) .................................................................. 51

*Muchnick v. Thomson Corp.*,
    509 F.3d 116 (2d Cir. 2007) ............................................................. 8

*Nichols v. Prudential Ins. Co. of Am.*,
    406 F.3d 98 (2d Cir. 2005) ............................................................ 20

*NLRB v. Teamster, Local 85*,
    1980 U.S. App. LEXIS 19972 (9th Cir. 1980)................................... 29

*Northcross v. Board of Education*,
    611 F.2d 624 (6th Cir. 1979), *cert. den'd*, 447 U.S. 911 (1980)......... 29

*N.Y. Ass'n for Retarded Children, Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983) .......................................................... 53

*Pennecom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004) ........................................................... 20

*Pyatt v. Raymond*,
    2012 U.S. Dist. LEXIS 161713 (S.D.N.Y. May 10, 2012)............... 50

*Reed v. A.W. Lawrence & Co.*,
    95 F.3d 1170 (2d Cir. 1996) ........................................................... 29

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2009) ........................................................... 8, 13, 33

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
    568 F.3d 345 (2d Cir. 2009) ........................................................... 54

*Rodriguez v. Disner*,
    688 F.3d 645 (9th Cir. 2012) .......................................................... 47

*Scott v. City of New York*,
    643 F.3d 56 (2d Cir. 2011) ............................................................. 53

*Silbiger v. Prudence Bonds Corp.,*
 180 F.2d 917 (2d Cir. 1950) ............................................................ 47

*Simmons v. N.Y. City Transit Auth.,*
 575 F.3d 170 (2d Cir. 2009) ............................................................ 50

*Singleton v. Wulff,*
 428 U.S. 106 (1976) ........................................................................ 20

*So v. Suchanek,*
 670 F.3d 1304 (D.C. Cir. 2012) ...................................................... 47

*Sprague v. Ticonic National Bank,*
 37 U.S. 161 (1939) .......................................................................... 19

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ........................................................................ 57

*Tasini v. New York Times Co.,*
 206 F.3d 161 (2d Cir. 1999) ...................................................... *Passim*

*The New York Times Co. v. Tasini,*
 533 U.S. 483 (2001) ............................................................ 1, 2, 21

*TigerCandy Arts, Inc. v. Blairson Corp.,*
 2012 U.S. Dist. LEXIS 35269 (S.D.N.Y. February. 23, 2012).......... 51

*Torres v. Green,*
 361 F.3d 96 (2d Cir. 2004) .............................................................. 28

*United States v. Aulet,*
 618 F.2d 182 (2d Cir. 1980) ............................................................ 28

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.,*
 623 F.3d 82 (2d Cir. 2010) ........................................................ 23, 30

*Wal-Mart Stores, Inc. v. VISA U.S.A.,*
 396 F.3d 96 (2d Cir. 2005) .............................................................. 31

*Wechsler v. Southeastern Properties, Inc.,*
    506 F.2d 631 (2d Cir. 1974) ............................................................... 30

*Wininger v. SI Management L.P.,*
    301 F.3d 1115 (9th Cir. 2002) ........................................................ 19

*Zervos v. Verizon New York, Inc.,*
    252 F.3d 163 (2d Cir. 2001) ............................................................ 17

## **<u>Rules, Laws & Statutes:</u>**

15 U.S.C.S. § 78u-4(a)(3)(B)(iii)(I)............................................... 24

17 U.S.C. § 504(c) ....................................................... 35, 36

28 U.S.C. 636(b)(1)(C) .................................................... 27

28 U.S.C. §1291 ............................................................ 1

28 U.S.C. §1331 ............................................................ 1

28 U.S.C. §1367............................................................. 1

28 U.S.C. § 1407............................................................ 6

Fed.R.App.P. Rule 10(e)................................................ 28

Fed.R.Civ.P. 23(h) ............................................. 24, 25, 27, 57

Fed.R.Civ.P. 58(a)(3)..................................................... 1

JURISDICTIONAL STATEMENT

This is an appeal by Non-Lead Counsel (hereinafter "NLC") from a final decision entered by the United States District Court for the Southern District of New York on June 10, 2014, awarding Counsel for the "A/B subclass" in a copyright infringement action $3,306,209.76 in attorneys' fees and expenses. (A-588). It awarded Counsel for another subclass ("C Counsel") $600,000 (A-587), and Appellant zero dollars for work in the case that established liability and laid the foundation for the class actions. (A-574-578). It then left it to A/B Counsel (hereinafter "A/BC" or "Lead Counsel") to determine how much NLC should be paid for work in the class actions. (A-588, ¶4).

The District Court had subject matter jurisdiction over the action under 28 U.S.C. §§1331 and 1367. This Court has jurisdiction over the appeal under 28 U.S.C. §1291. Appellant's Notice of Appeal from the June 10, 2014 Order was timely filed on July 9, 2014. (A-589). The Decision and Order appealed from finally disposed of two motions for attorneys' fees and related objections. The Decision and Order were immediately appealable. No separate judgment document was required. Fed.R.Civ.P. 58(a)(3).;

ISSUES PRESENTED FOR REVIEW

(1)     Is non-lead counsel who files a motion for attorneys' fees under Rule 23 (h) entitled to a judicial determination?  Alternatively, can the court in a non-PSLRA case delegate any of its authority over fees, including its power "to allocate," to private class action counsel?

(2)     If the court *can* delegate, at some point can it make an outright grant and completely divest itself of its authority over fees?  Or, by doing so, does it deprive counsel of due process and improperly restrict her right of appeal?

(3)     Where counsel have made different contributions to a case, how should fees be allocated under equitable fund principles – commensurate with the contributions made or simply the hours worked?

(4)     Can work performed and contributions made in one case be compensated in another or was the District Court here precluded from compensating NLC for her work in *New York Times Co. v. Tasini*?  If it was not precluded, to what extent was it appropriate to compensate for such work and to what, if any extent, inappropriate?  Was the failure to compensate at all an abuse of discretion?  In what phases of the *Tasini* case was NLC involved?

(5)     Can a fee-sharing agreement entered into among Lead Counsel be applied to Non-Lead Counsel, even though she was never a party to it, it was only

disclosed to her several years after parties entered into it, and it was not timely disclosed to the Court as required by the law of this Circuit?

(6)     Even assuming that an allocation could have been made in this case simply by comparing properly-constituted lodestars, did the lodestars A/BC used satisfy that description or should they have been rejected as contrary to law?  This question subsumes three others:

(a)     Did A/BC include hours in their own lodestars that should have been excluded under the law?

(b)     Did they exclude hours from NLC's lodestar that should have been included?

(c)     Were the hourly rates A/BC used improper under *Goldberger*, the common fund doctrine, principles of unjust enrichment and the established law of this Circuit?

(7)     Did the District Court abuse its discretion, under the law of this Circuit and circumstances of this case, in failing to require A/BC or some subset of them to produce contemporaneous time records?

(8)     Was NLC afforded due process?

(9)     Finally, did the District Court err in ruling that NLC lacked standing to make the above objections?

## STATEMENT OF THE CASE

In 1993, a copyright infringement action was brought against print and electronic publishers for incorporating freelancers' articles into electronic databases and making them digitally retrievable as stand-alone works. The case was known as *Tasini v. The New York Times*. It was carefully designed so as to pave the way for an industry-wide class action. (A-216-233, A292-298, A-338-341, A342-346). The District Court ruled in substantial part against the Freelancers, but the Second Circuit reversed. It found that the publishers' actions had infringed the freelancers' copyrights and remanded with directions to the District Court to enter judgment in the freelancers' favor. *Tasini v. New York Times Co.*, 206 F.3d 161, 163 (2d Cir. 1999).

Within a few weeks of that decision, law firms not involved in the *Tasini* case began working on follow-up class actions. (A-126, ¶2). Between August and November of 2000, three class actions were instituted. They are generally referred to as the *Posner*, *Authors Guild* and *Laney* cases. (A-52-59; A-25-47).

Appellant is the attorney who conceived of the *Tasini* case and litigated it – at first, alone, in the United States District Court for the Southern District of New York and, then, with other counsel, before the Second Circuit and the United States Supreme Court. She was also the attorney who initially conceived of and, together with the firm of Girard & Green, instituted one of the three class actions –

specifically, the *Laney* case. The *Laney* case differed from the other two class actions in a very significant respect: It asserted *Tasini* claims not only on behalf of freelancers who had registered their works with the United States Copyright Office, but also on behalf of those who hadn't. In other words, it asserted damage claims for the infringement of both "registered" and "unregistered" works and included both sets of claimants in the Class it sought to represent.

The only United States works as to which the other two cases (the *Authors Guild* and *Posner*) asserted damage claims were works that had been registered with the U.S. Copyright Office. Because so few freelancers register, *Laney's* assertion of damage claims for the infringement of unregistered works ultimately led to a dramatic expansion in the class action. Indeed, in the final analysis, fully 97% of the claims covered by the MDL are for the infringement of unregistered works. At most, 3% are for the infringement of registered works. *See Literary Works*, 654 F.3d at 246 ("Category C claims comprise more than 99% of authors' total claims"). See also (A-514: Category C claims account for approximately 306,000 out of 314,000 claims).

On November 6, 2000, the United States Supreme Court granted certiorari in the *Tasini* case. *New York Times Co. v Tasini*, 533 U.S. 483 (2001). When it did, parties on both sides of the MDL requested that the class actions be stayed, reasoning:

> "If Tasini is upheld … defendants' liability to plaintiffs will be established as a matter of law, and the parties will be left to quarrel over…class certification and damages.  If the Supreme Court bestows on defendants the unfettered right to electronically copy and republish freelance works without the authors' permission, then these [class action] cases may fall away.

(A-304-305)(material in brackets added for clarification).[1] Accord, Defendants' Joint Reply in Support of Stay Pending Completion of Supreme Court Review of Tasini v. New York Times Co. at 8 ("It is unimaginable that the court would want to enter the Tasini thicket in a putative class action context while Tasini itself remains unresolved").  The Court was persuaded by the parties' arguments, placing the MDL on the suspense docket "until the Supreme Court issues its decision in Tasini." 2001 U.S.Dist. LEXIS 2047 *9 (S.D.N.Y. 3/1/01). The parties were directed to contact the Court "within 30 days of the date of that decision."  *Id.*  The focus then shifted to the Supreme Court.

There, no one was under any illusion that *Tasini* was of limited scope. Everyone understood that it implicated industry-wide practices and norms, and the five print and electronic publishers that had been selected as 'stand-ins' for the

---

[1]     *See also* Memorandum of Points and Authorities in Support of [Laney] Plaintiffs' Motion for Transfer and Coordination or Consolidation under 28 U.S.C. § 1407 at 1, 2 (where Laney counsel state:  "Tasini … raises identical questions of fact and law" to the class actions); Memorandum in Support of Joint Responses of Authors Guild and Posner Plaintiffs to Motion for Transfer and Consolidation of Actions at 6 (where counsel for two cases state that "*Tasini v. New York Times* … established as a matter of law that the identical practices at issue here [in the class actions] violated the copyrights of freelance authors").

entire industry made this unequivocally clear to the Supreme Court. They told the Court that if the six *Tasini* freelancers won, print and electronic publishers everywhere would be forced to purge the 'nation's archive' *of all freelancers' works* and the result would be "gaping holes in the electronic record of history." 533 U.S. at 505. Recognizing that the defendants had raised an industry-wide alarm, the Supreme Court responded with industry-wide solutions. Instead of removing articles, it said, either "Authors and Publishers[ ] could enter into an agreement allowing continued electronic reproduction of the Authors' works" or a court could "draw on numerous models for distributing copyrighted works and remunerating authors …." *Id.*

Within a few weeks of the Supreme Court's affirming the Second Circuit, the class actions were restored to the Docket and the actions consolidated for pre-trial purposes. (A-33, A-42, A-46). Within two days of their consolidation, the cases were referred to private mediation. A-33, A-42, A-46. Five weeks later, counsel filed a Complaint for the Consolidated Amended Class Action Complaint. (A-84). In that Complaint, Lead Counsel averred that "a class action provides the most effective and meaningful vehicle to effectuate the Supreme Court's decision [in *Tasini*] and enforce the liabilities that Court established." (A-78)(material in brackets for clarification). In other words, the intent was that the MDL afford the global relief that *Tasini* and the Supreme Court had envisioned.

Since then, both the United States Supreme Court and Second Circuithave confirmed that the class actions piggybacked on *Tasini*. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 158 (2009) (noting that, in *Tasini*, "we agreed with … the Second Circuit" and "affirmed the principal theory of liability underlying copyright infringement suits that other freelance authors had filed after the Court of Appeals had issued its Opinion") ; *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 245 (2d Cir. 2011); *Muchnick v. Thomson Corp.*, 509 F.3d 116, 118 (2d Cir. 2007), *rev'd sub nom. Reed Elsevier, Inc. v. Muchnick*, *supra*.

The First Settlement And Lead Counsel's and NLC's Respective Motions
<u>for Attorneys' Fees</u>

In 2005, the parties in the MDL reached a settlement, which received preliminary Court approval.  A/BC then put in a motion for attorneys' fees that purported to cover all Class Counsel, including NLC.  (A-125-210; A-200-210).  However,  because they refused to seek any compensation on her behalf for her *Tasini* work (A-443-444), even though it had benefited the Class, NLC ended up making a motion for a supplementary award of fees. (A-211-355; A-374-418).  In her motion, she fully explained why a combined award was warranted for her work in the two cases.  (A-214-232,

233-235, A-335-337, A-339, A-390-397).

NLC supported her motion with five volumes of contemporaneous time records, covering

|   | Description Of Phase | Level | Total Hrs. Worked | Hrs. That Benefited Individuals | Hrs. That Benefited Class |
|---|---|---|---|---|---|
| 1 | Tasini Dist. Ct. | Partner | 2235.16 | 457.85 | 1777.31 |
|   |   | Assoc. | 1067.96 | 524.64 | 543.32 |
|   |   | P/L | 369.34 |   | 369.34 |
|   | Dist. Ct. Total |   | 3,672.46 | 982.49 | 2689.97 |
|   |   |   |   |   |   |
| 2 | Tasini 2d Cir. | Partner | 433.08 | 0.98 | 432.10 |
|   |   | Assoc. | 126.47 | 30.5 | 95.97 |
|   | 2d Cir. Total |   | 559.55 | 31.48 | 528.07 |
|   |   |   |   |   |   |
| 3 | Tasini S.Ct. | Partner | 566.27 | 31.64 | 534.63 |
|   |   |   |   |   |   |
| 4 | MDL | Partner | 701.34 |   | 701.34 |
|   |   |   |   |   |   |
| 5 | Tas. Remand | Partner | 159.70 | 159.70 |   |
|   |   |   |   |   |   |
|   | Tas. Subtotals | Partner | 3394.21 | 650.17 | 2744.04 |
|   |   | Assoc. | 1194.43 | 555.14 | 639.29 |
|   |   | P/L | 369.34 |   | 369.34 |
|   | Tasini Totals |   | 4957.98 | 1205.31 | 3752.67 |
|   |   |   |   |   |   |
|   | Total / MDL |   | 701.34 |   | 701.34 |
|   |   |   |   |   |   |
|   | Total Contrib. |   |   |   | 4454.01 |

She also reported the payments her firm received for work on *Tasini*. They fell into two categories: (1) installments paid over the course of the first six years of the *Tasini* litigation –that is, during the District Court Phase, totaling $295,000 (A-314, "Amount Paid" Column); and (2) a lump sum payment in the amount of $200,000 paid when the *Tasini* case settled. (A-317, ¶1.b)[2] The first series of payments were paid at subsistence levels,[3] intended to enable her firm to meet rent and expenses until it could apply to a court for fees. (A-376). The lump sum payment was intended to compensate work that benefited individuals (A-235-236), but not the class as a whole. (A-319, ¶7). The Settlement in Tasini between Defendants and Plaintiffs was specific in this regard. It stated:

> 7. The parties agree that the attorney fee payments called for in Paragraph 1 of this Agreement compensate Plaintiffs only for the fees and expenses incurred by their counsel in pursuing the individual claims in the Tasini Action, and do not compensate counsel for work performed or costs incurred in the Tasini Action

---

[2] The total that NLC's firm was paid *in fees* for *Tasini* work over the period between 1993 and the present was $495,000 as reflected in her Affidavit, and ***not*** $650,000 as elsewhere reported. (See, e.g., A-447, A-449). The error arose because NLC was asked to report the total "payments" she received in connection with the case and she answered the question quite literally. The $640,000 figure she reported on the fourth page of the Chart for "payments" included $145,000 in expense reimbursement and advance payments to cover costs. (A-315, last column). Payments reflecting *fees* received are accurately reflected in the "Amounts Paid" column on the third page. (A-314).

[3] NLC's firm was paid $135/hr for partner-level work, $85/hr for associate-level work, and $25/hr for paralegals. (A-236-237 ¶93; Also, A-314, "Amount Paid" Figure divided by Hours).

> that benefited the class contemplated by the MDL. It is the parties' understanding that counsel should be compensated for such work and costs out of the common fund created in the MDL to the extent permitted by law and as determined by the Court.

(A-319, ¶7).

Significantly, NLC was not paid for her work during either the Second Circuit[4] or Supreme Court Phases of *Tasini*. (A-238-239 ¶¶ 99, 102). This was, in part, because she was not paid fees during the course of those two phases and, in part, because she was not paid for "common benefit hours" when the *Tasini* case settled. Virtually all her work during these phases –and a substantial portion of her work in the District Court -conferred a benefit on the Class.

When A/BC (then called Lead Counsel) responded to NLC's supplementary fee motion, they took two tacks. Their principal tack was to attack NLC's character and competence. (See e.g., A-356-360; A361-365; A-445; A-460-461). Their secondary tack was to say that, because *Tasini* was a "separate" lawsuit, MDL fees could not be awarded for work performed in it, regardless to whom the benefit accrued. (e.g., A-443-444).

In her Reply Papers and Affidavits, NLC refuted their legal arguments and thoroughly discredited their attacks on her competence and person. (e.g.,

---

[4]     The UAW advanced NLC's Office $2,946.59 in expenses during this period, but did not pay any fees. (A-238, ¶100). During the Supreme Court Phase, they neither paid fees nor advanced or covered expenses. (A-239, ¶103).

A-341, A-384-385, A-390-397)  Indeed, Mr. Tasini's own lawyers,

including the lawyer who had argued in the United States Supreme Court

and former General Counsel to the UAW, stepped up to the plate to set the

factual record straight.  (A-374-382, A-398-400).  Former General Counsel

Rossen provided two redacted documents that irrefutably demonstrated the

falsity of Mr. Tasini's key accusation, (A-374-375 ¶2, A-378-382), and both

he and Laurence Gold from Bredhoff & Kaiser praised NLC's work and

urged the District Court to grant her application for fees.  (A-341, A-400).

On November 3, 2005, the District Court held a conference regarding

NLC's Tasini fee application.  (A-419-461).  During colloquy with counsel,

the Court observed that the relationship between *Tasini* and *In re Literary*

*Works* was unlike any other it had seen:

> [F]actually this is not like any other case that I
> have seen. … [T]his is a case where it was clear
> from the beginning … that all parties made a
> conscious decision to allow Tasini to decide the
> substantive issue in this case. The parties forwent
> a significant amount of work in this case simply
> because the work was being done in Tasini.
> Whether or not that is quantifiable or compensatable
> is a different question. But it seems to me that
> that and some other issues really make this in and
> of itself a unique set of circumstances . . .

(A-425).  Although the Court anticipated making the resolution of the issue regarding the compensability of *Tasini* work a "priority decision[]" and resolving it "in the next four to six weeks," (A-461), events intervened.

Objectors appealed, claiming that the Settlement was not fair, reasonable and adequate.  This Court then honed in on a truly difficult issue: whether the District Court had subject matter jurisdiction over claims that unregistered works had been infringed and whether persons holding those claims could be included in the Class.  The Supreme Court answered this question in the affirmative, see *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2009), and the case was remanded for consideration of the settlement's fairness.   This Court concluded that subclasses needed to be created and, at a minimum, "C" claimants represented by separate and independent counsel. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).

Although NLC made it clear, throughout this period, that she was ready, willing and able to work, A/BC did not assign her work or keep her apprised of the litigation.  (A-534).   After this case was remanded to the District Court, they made it clear, again, that they had no intention of utilizing her services.  (A-536).  This time, the rebuff took the form of suggesting that they couldn't assign her work or discuss the case with her

because she had never been "a court-appointed Class Counsel." (A-536). (*But see* A-532).

In March of 2014, NLC learned that a Revised Settlement Agreement had been reached and received preliminary approval. (A-534). The plan of allocation had been improved by some 14% for the "C" claimants. (A-509). It remained precisely the same for members of the "A/B" subclass. (A-468.2, ¶¶3.a, 3.b). As far as attorneys' fees are concerned, Para. 9.c contemplated that A/BC would have the authority to allocate fees in the "manner in which A/B Counsel in good faith believe reflects the contribution of … [co-counsel] to the prosecution and settlement of the Action." (A-470).

A/BC applied anew for fees (A-476-505), and NLC renewed her objections. (A-516-529, A-538). On the eve of the Final Fairness hearing, A/BC prepared an order to substitute for RSA, ¶9.c. In ¶9.c, as already noted, they represented that allocations would be made on a "contributions"-made basis. (A-470). Now, they indicated, instead, that they would be made on a "time spent" basis, "in the manner set forth in … [their] fee application." (A-511, A-588, ¶4). The formula they set forth there was the one from the fee-sharing agreement they had entered into among themselves

at the commencement of the litigation.  (A-448, A-546). That formula and

agreement were only disclosed to NLC several years later.  (A-561, A-564).

There was another circumstance that overshadowed all else, however

–at least from NLC's perspective:  It transpired that the only Court papers

that could be found for the case were those that had been filed in 2013 and

2014.  That meant that all of NLC's motion papers from 2005 were missing.

(A-542; A-19 Dkts #53-55) (These are the papers at A-211-356 and A-374-

419, as well as a legal memorandum.)  As a consequence, at the time of the

Final Fairness Hearing, the only motion papers from 2005 the District Court

could have had access to were A/BC's five "opposition declarations."  (A-

356-373)  And, they were only available to it because A/BC re-filed them as

attachments to a brief on June 3, 2014. (A-17, Dkt #44, Attachments # 1

through 5 to Opposition Brief).

On June 10, 2014, the District Court, the Honorable George B.

Daniels presiding, ruled from the bench.  It approved the Settlement, and

awarded $3,906,209.76 in fees and expenses. Of that amount, it awarded

"C" Counsel $600,000 and A/BC, $3,306,209.76. (A-588). It also authorized

A/BC to allocate fees in the manner set forth in their application and F/SA.

(*Id.*)  It denied NLC's motion and awarded her zero dollars.  It expressly did

so on two bases --strictly as a matter of law and on the basis of a second

theory that was predicated on one factual finding. (A-574-578). Its two legal theories were untenable, *see* Point I, *post*, and its finding of fact, clearly erroneous. (*See* A-340 ¶¶10-13, A-399-400, A-396-397).

On July 9, 2014, NLC made a motion to restore many of the missing documents to the record, by seeking leave to post them as electronic documents. (A-19, Dkt. #53) The District Court granted the motion (A-20, Dkt. #62) and her 2005 motions papers were e-filed. (A-21-22 #67 through 81). On July 9, NLC also appealed. (A-20, Dkt. #56).

## SUMMARY OF ARGUMENT

A secret compact describing how to divvy up fees. Missing documents. A false statement that misleads the Court and lays the basis for shortchanging a key participant. An unlawful delegation of authority that mistakenly turns over responsibility to interested parties rather than a neutral – thereby enabling an audacious robbing of Peter to pay themselves.

Are these the elements of a pulp fiction novel? No--the actual if sorry events in the litigation below.

This is an appeal that concerns an allocation of fees and misallocation of authority. Appellant contends that in a non-PSLRA case, the Court cannot cede its authority to private counsel. It either must make the decisions itself regarding fees or make an appropriate reference to a Magistrate. In either event, under the

common fund doctrine, the key criterion in determining the amount of an allocation is the benefits conferred – it is not only hours worked.

The ultimate purpose is to avoid unjust enrichment. Here, it was fostered. Counsel who represented 3% of the Class, whose application is not supported by the *Goldberger* factors and who piggybacked on the efforts of others were rewarded with 82% of the fees. Counsel on whose efforts they piggybacked, who was largely responsible for establishing the liability principles upon which the case was founded and discovering the cause of action on behalf of the "unregistered," was only eligible under the formula for perhaps 4.2%. This appeal seeks review.

## ARGUMENT

Preliminary Note on Standard of Review

Typically, an attorneys' fee award is reviewed for abuse of discretion, and abuse is found in three circumstances: where a district court (1) applies the wrong legal standard or principles; (2) bases its decision on a clearly erroneous factual finding or (3) reaches a conclusion that cannot be located within the range of permissible decisions. *Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 169 (2d Cir. 2001). *See Koon v. United States*, 518 U.S. 81, 100 (1996)("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence").

I.    The District Court Abused Its Discretion In Denying NLC
      Compensation For *Tasini* Work That Unquestionably
      Benefited The Class.

The District Court treated this case as though it were a *Cendant*-type PSLRA

case in which *Tasini* work presented a pre-appointment question. It consequently

decided that one issue.

It finally decided the issue on June 10, 2014, when it denied NLC's fee

motion in toto. (A-574-579, 582). It concluded that it was precluded from

awarding NLC fees for *Tasini* work because the work had been performed in a

"separate" lawsuit. (A-576-577). It also ruled, in the alternative, that even if it

wasn't precluded from compensating work performed in another lawsuit, the only

*Tasini* work that was "relevant" to the class actions was work performed in the

Supreme Court Phase. (A-577, A-582). NLC was not eligible to be paid for such

work, the D.Ct. found, because (allegedly) she had not participated in that phase of

proceedings. (A-582).

The District Court's decision rested on an erroneous view of the law and a

clearly erroneous factual finding.

A.      The District Court Erred In Concluding That Contributions Made In
         Another Case Could Not Be Compensated In This One.

Standard of Review:   De novo.

The assertion that a court is precluded from awarding fees out of a common fund in one lawsuit for work done in another is without any foundation.  In fact, there is over a century of clear and unequivocal precedent and pronouncements to the contrary.  *See, e.g., Sprague v. Ticonic National Bank*, 37 U.S. 161, 167 (1939); *Cowdrey v. Galveston, Houston and Henderson R.R. Co*., 93 U.S. 352 (1876); *Milliron v. T-Mobile United States*, 423 F.ed. Appx. 131 (3d Cir. 2011); *Wininger v. SI Management L.P.*, 301 F.3d 1115 (9th Cir. 2002); *Gottlieb v. Barry*, 43 F.3d 474, 489 (10th Cir. 1994); *GulfStream III Associates, Inc. v. GulfStream Aerospace Corp*., 995 F.2d 414 (3d Cir. 1993); *County of Suffolk v. Long Island Lighting Co*., 907 F.2d 1295, 1327 (2d Cir. 1990); *Bebchick v. Washington Metropolitan Area Transit Commission*, 805 F.2d 396 (D.C. Cir. 1986); *Klawock v. Gustafson*, 585 F.2d 428, 431 (9th Cir. 1978); *Doherty v. Bress*, 262 F.2d 20 (D.C. Cir. 1958), *cert. den'*d, 359 U.S. 934 (1959); *In re Linerboard Antitrust Litigation*, 292 F.Supp. 2d 644 (E.D. Pa. 2003); *Dubin v. E.F. Hutton Group Inc*., 845 F.Supp. 1004 (S.D.N.Y. 1994)(Roberts, Mag. J.), *aff'd as modified*, 878 F.Supp. 616 (S.D.N.Y. 1995).

In any event, for two reasons A/BC should have been estopped to invoke *Tasini's* separateness as a basis for denying fees.  First, because, in court filing

after court filing early on in the case, they made a clear and compelling record of the cases' fundamental inseparability. Second, because AB/C alone were responsible for the cases technically remaining "separate." (A-414-417).

"The equitable powers of [the] court can never be exerted in behalf of one who … by deceit or any unfair means has gained an advantage." *Bein v. Heath*, 47 U.S. 228, 247 (1848), quoted in *Pennecom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004).

> B.   It Further Erred In Concluding That The Only
>      *Tasini* Phase That Was Relevant To The MDL
>      <u>Was The One In The Supreme Court Phase</u>.

Standard of review:  De novo.

While both the District Court and AB/C ultimately concede that *Tasini* conferred a benefit , they try to claim the benefit is only attributable either (i) to the "Supreme Court's decision," but not to counsel (A-582), or (ii) only to counsel's work in the final phase. (A-577). Neither of these contentions is sustainable in this case because work in all three *Tasini* phases must necessarily have contributed to the Supreme Court victory. How can we say this so unequivocally?  For at least three reasons.  First, because as a general rule, "a court of appeals will not consider an argument raised for the first time on appeal."  See, e.g., *Singleton v. Wulff*, 428 U.S. 106, 120-21 (1976); *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 106 (2d Cir. 2005). (Also, see A-395-397). Second, because in *Tasini* specifically, the

Supreme Court affirmed the Second Circuit, *see N.Y. Times Co. v. Tasini*, 533 U.S. 483, 506 (2001), which had reversed and remanded to the District Court with instructions to enter judgment in the freelancers' favor. *Tasini v. New York Times Co.*, 206 F.3d 161, 163, 172 (2d Cir. 1999). That means that both appellate courts viewed the freelancer representatives in *Tasini* as having been entitled in the first instance to summary judgment in the District Court. It also means that the record and arguments developed there were *sine qua non* for the Supreme Court's decision. (A-247-291; A-395-397) Third, because the early record in this case is replete with admissions that the class actions, if not actually cloned from *Tasini* in the 1999-2000 timeframe, were nonetheless its spitting image or fraternal twin. (*See* Statement of the Case, *ante*). In that timeframe, the Supreme Court had not yet even granted *certiorari*.

NLC fully recognizes that the fact that work in all three phases benefited the Class does not automatically mean that **all** *Tasini* hours could appropriately be included in an MDL lodestar or that it would have been or be an abuse of discretion to compensate only a percentage of the work or work after a certain date. The question, obviously, is one of degree. How far back can one reasonably go in compensating work that has benefited a Class or upon which a class action has piggybacked? *Cendant II* suggests one possible answer --the statute of limitations. In other words, it suggests that work within the statute of limitations that has

benefited the Class should be compensable as a matter of course, while work

beforehand might not be compensated automatically. In this case, that would

mean, at a minimum, that work and contributions going back to August 15, 1997

should have been deemed compensable and included in counsel's lodestar. (A-76,

¶55).

That would cover the second and third phases of *Tasini* work –i.e., the

Second Circuit and Supreme Court proceedings. (The District Court phase in

*Tasini* ended on August 13, 1997 with the District Court decision.) Since the work

performed in next two phases was unquestionably of benefit to the Class and was

not otherwise compensated, (A-238-239, ¶¶99, 102; A-314, "Amount Paid"), NLC

respectfully suggests, under the circumstances, that constituted a floor below

which the *In re Literary Works* Court could not go without abusing its discretion.

C.    The District Court's Finding That NLC Did Not Participate <u>In The
Supreme Court Phase Was Clearly Erroneous</u>.

Standard of review: Clearly erroneous.

A/BC's papers have erroneously suggested over time that NLC did not

participate in either the Second Circuit or Supreme Court phases of the *Tasini* case.

The actual facts are unequivocally to the contrary. NLC participated in all

three phases. (Background & D.Ct. Phase: A-214-227; Second Circuit Phase: A-

227-228; S.Ct. Phase: Q-229-233; A-339-341). The National Law Journal

designated her as a "standout lawyer" for her work in the Second Circuit and two

out of the three lawyers who represented Mr. Tasini in the Supreme Court[5] have attested to the quality of her work during both appellate phases. (A-339-341; A-399-400). Indeed, they each supported her fee application.

II.     The District Court Erred In Thereafter Ceding Private Counsel Authority Over Fees.  It Was Required In This Non-PSLRA Case To Make Fee Determinations Itself.

Standard of Review:  De novo.

In their fee application, A/BC asserted that it was appropriate for them to allocate any award between themselves and Co-Counsel.  (A-510-511). Consistent with that position, they provided for the Court to cede them that authority -first, in ¶9.c of the Revised Settlement Agreement and, then, in a proposed Order they substituted for ¶9.c at the last minute.  (A-470, A-588).  The delegation was unlawful for at least five reasons.

First, in contrast with PSLRA cases, there is no Congressional or statutory basis for the delegation.  See *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82 (2d Cir. 2010) and *In re Initial Public Offering Securities Litigation*, Case No. 21 MC 92 (SAS), 2011 WL 2732563 (S.D.N.Y. July 8, 2011). A class action under the PSLRA differs from a non-PSLRA class action in at least two significant respects.  Under the PSLRA, the Court is required to select an institutional investor or other plaintiff with a large financial stake in the case to

---

[5]     The third lawyer, Patricia Felch, died in March of 2005.

serve as "lead plaintiff." 15 U.S.C.S. § 78u-4(a)(3)(B)(iii)(I). Once the lead plaintiff is appointed, it is "assigned the right to appoint and duty to monitor lead counsel for the class." 404 F.3d at 180. Once lead counsel are chosen, they control decisions regarding the assignment and compensation of class counsel. *But, this is not a PSLRA case,* and no comparable statutory scheme is involved. Accordingly, the Court retains plenary authority over the assignment and compensation of counsel.

Second, even in PSLRA cases – decisions regarding contributions made *pre*-appointment are for the Court to make, not lead counsel. (*Cendant* II, 404 F.3d at 194-95, 197). Here, most of the contributions for which NLC requested compensation were made *pre*-appointment. That includes *both* her establishment in *Tasini* of the principles on which the MDL defendants were liable for infringement and her inclusion of the unregistereds in the Class. But for her work in the latter regard, there would not have been a Complaint filed for damages on behalf of a Class of U.S. authors for the infringement of both "registered" *and* *"unregistered"* works. Since all of this transpired pre-appointment, it was for the Court and not A/BC to make all decisions regarding NLC's compensation.

Third, in non-PSLRA cases such as this one, A/BC isn't competent to make fee determinations at all, *either* as to *pre*- *or* post-appointment work. This conclusion is required by Fed.R.Civ.P. 23(h). Under the present rule, all

applications for attorneys' fees must be made by motion and on notice, whether they are made by Lead, Non-Lead or Non-Designated Counsel. Fed.R.Civ.P. 23(h)(1). As to each applicant, the Court must make findings of fact and conclusions of law. Fed.R.Civ.P. 23(h)(3). While it is empowered to refer issues concerning the amount of the award "to a special master or … magistrate . . ." (Fed.R.Civ.P. Rule 23(h)(4)), it is nowhere given the authority to refer such issues to private counsel for a preliminary ruling, let alone to divest itself of such authority outright.

Fourth, since A/BC were neither disinterested nor impartial in the matter of fees, permitting them to determine NLC's allocation was a denial of due process. It is one of the hallmarks of the American legal system that controversies are decided by neutral, unbiased and independent decisionmakers.

Fifth, even beyond the question of self-interest, A/BC disqualified themselves from determining NLC's allocation by their conduct. *See, generally*, *Cendant II*, 404 F.3d at 200. They failed to disclose the fee-sharing arrangement they had agreed to among themselves until four years into the litigation. *See In re Agent Orange*, 818 F.2d at 226 (requiring disclosure at the time such an agreement is entered into). They announced that they had no intention of allocating fees in conformity with either ¶9.c of the RSA or the applicable legal standard. (A-511, last ¶; A-587). During the past nearly ten years, they have assigned NLC

25

absolutely **no** work, although they acknowledge she has been "ready, willing and able" to undertake assignments.  (A-534 ¶35-36; A-507).  At the same time, they have freely made use of her earlier work and theories and begun to charge *her* for the privilege of doing so.[6]  *See* Point V, *post*.  They have, thereby, effectively utilized her work not only to increase their own lodestars, while keeping hers frozen, but also to justify transferring or crediting money to themselves that they previously said she had earned.

On top of that, although they concede the class has benefited from *Tasini*, they have excluded every second of her *Tasini* time from her lodestar.  (They have thereby excluded between 1062.70 and 3752.67 hours from her lodestar that should have been included.)  By contrast, they have included untold numbers of hours in their own lodestars that should, by law, have been excluded. *See* Point VI (A), *post*.  By failing to produce contemporaneous time records, however, in support of their applications, they have deprived NLC of the ability to gauge the extent to which their lodestars are overstated.  (A-517). They have ensured, by these means,

---

[6]   A/BC have long accused  NLC of claiming a copyright on her legal theories and demanding that A/BC pay to license them.  A/BC have it backwards.  First of all, this dispute is not governed by copyright; it is governed by the equitable fund doctrine and law of unjust enrichment.  Under those principles, A/BC is not entitled to claim fees for benefits to the extent that others have conferred them.  *See* cases cited, *ante*, in Point IV.  Second, NLC has never objected to A/BC's using her arguments.  (In fact, she encouraged that.)   She objects *to their charging **her*** for its use.  (*See* Points V and VI, *post*). By this point, their charges would appear to add up to some one hundred thousand dollars or more. (*See* Points V and VI, *post*).

that if they are permitted to make allocations pursuant to their "time-spent"

formula, they will recoup some of their losses ***from NLC***, and get a greater share of

the fees available for division.

III.   The District Court Erred In Conferring Greater Powers On
       <u>A/BC In This Case Than Are Possessed By A U.S. Magistrate</u>**.**

Standard of Review:  De novo.

If the Court had assigned the competing applications for attorneys' fees in

this case to a Magistrate, under Rule 23(h), rather than to private counsel, the

Magistrate would have made a specific recommendation as to how the attorneys'

fees in this case should be allocated.  That recommendation would have been

included in a "Recommendation and Report," which was filed automatically and

made an official part of the record. 28 U.S.C. 636(b)(1)(C). Also see Fed.R.Civ.P.

Rules 23(h)(4), 54(d)(2)(D) and 72(b).  NLC would then have had the opportunity

to appeal the Recommendation & Report to the District Judge and it would have

been accepted, rejected or modified, and the result would have been embodied in

an order that was itself automatically filed.  At that stage, NLC would have had the

right and opportunity to appeal to this Court based upon an adequate record.  In

other words, it would have been able to appeal based upon a record, and from an

order, that included specific determinations of the amount she (1) was being

allocated and (2) would be paid.

AB/C have made these determinations, but NLC cannot share them with this Court because the single document in which they are embodied is neither part of the District Court record,[7] nor itself an appealable order. It follows that, by delegating its authority to allocate fees in this case to private counsel rather than assigning the allocation question to a Magistrate, the District Court rendered A/BC's subsequent determinations regarding allocation and payment, unreviewable. It thereby abridged NLC's right of appeal and deprived her of due process.

IV.     The District Court Erred In Permitting Lead Counsel
         To Allocate Fees Commensurate With Hours Worked
         <u>Rather Than Contributions Made</u>.

Standard of Review: De novo.

Generally, attorneys for a prevailing party under a fee-shifting statute are compensated for all work on statutory claims.[8] *See Blanchard v. Bergeron*, 489

---

[7]     NLC made a motion to the District Court under Fed.R.App.P. Rule 10(e) to include this and other documents in the appellate record. A/BC objected to including this document and on October 6, 2014, the District Court denied NLC's request. Since this Court has greater powers than the District Court to supplement the record, it is NLC's intent to move this Court under Rule 10(e) and *United States v. Aulet*, 618 F.2d 182, 187 (2d Cir. 1980) to include the document in the record. Should such a motion be granted, this Point would become moot in whole in or in part.

[8]     They will not, of course, be compensated for work on "wholly unrelated" claims, such as common law claims, or where their success on the statutory claims has been minimal. *See, e.g., Torres v. Green*, 361 F.3d 96 (2d Cir. 2004)(limited success); *Carroll v. Blinken*, 105 F.3d 79 (2d Cir. 1997)(minimal success).

U.S. 87, 91 (1989)("counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter'"); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1997); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996); *Lunday v. City of Albany*, 42 F.3d 131,*8 (2d Cir. 1994)("So long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount"); *Northcross v. Board of Education*, 611 F.2d 624, 636 (6th Cir. 1979), *cert. den'd*, 447 U.S. 911 (1980)(same); *NLRB v. Teamster, Local 85*, 1980 U.S. App. LEXIS 19972 (9th Cir. 1980)(same).

In a case governed by common fund principles,[9] the rule is very different. Whether fees are determined on a percentage of recovery or lodestar basis, attorneys are only to be compensated for benefits they have conferred on the Class. *See, e.g.*, *In re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 226, 237 (2d Cir. 1987)("The critical inquiry when reviewing hours billed to the common fund in a class action is whether the work performed resulted in a benefit to the class"). *Accord*, *Milliron v. T-Mobile United States*, 423 F.3d Appx. 131, 135 (3d Cir. 2011)("The District Court's inquiry correctly focused on the essential

---

[9] The parties have agreed in the R.S.A. that there is no prevailing party here. (RSA, ¶11.p). Therefore, the Copyright Act's fee-shifting provision does not apply.

consideration, the benefit to the class, not the amount of time expended"); *Victor v. Argent Classic*, 623 F.3d 82, 87 (2d Cir. 2010)(in a PSLRA case, "when a substantial benefit has been conferred on the class, non-lead counsel are entitled to reasonable compensation"); *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 165-66 (3d Cir. 2006) ("whenever a district court awards attorneys' fees in class action cases, "[w]hat is important is that the district court evaluate what class counsel actually did and how it benefitted the class"); *In re Cendant Corp. Sec. Litig.*, 404 F. 3d 173, 191(3d Cir. 2005)(under the common fund doctrine, "[t]he cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class"). In other words, counsel in a case governed by common fund principles are not supposed to be compensated for failure, only success, and only to the degree to which they are the "competent producing cause." *See, e.g.*, *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995)(in a common fund case, "the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure"); *Wechsler v. Southeastern Properties, Inc.*, 506 F.2d 631, 635 (2d Cir. 1974)(attorneys must be the "competent producing cause" of the benefits for which they claim fees); *Blau v. Rayette-Faberge, Inc.*, 389 F.2d 469 (2d Cir. 1968)(same); *Gilson v. Chock Full O'Nuts Corp.*, 331 F.2d 107 (2d Cir. 1964)(in banc)(same); *In re Flonase Antitrust*

*Litig.*, 951 F.Supp. 2d 739, 748 (E.D.Pa. 2013).  Only a "contributions-made"
rather than a "time-spent" approach to the allocation question is consistent with
these rules and principles.

The District Court violated these precepts when it permitted A/BC to switch
from a contribution-based to strictly time-based allocation formula on June 10,
2014.  (*Compare* A-470, ¶9.c with A- 511).  This switch removed *Goldberger* from
the equation and made a consideration of the benefits various counsel have
conferred irrelevant.  Fortunately, the law of this Circuit is to the contrary.  This
Court has wisely decreed that irrespective of the method used to evaluate legal
services (i.e., percentage of recovery or lodestar), "the 'Goldberger factors'
ultimately determine the reasonableness of a common fund fee."  *Wal-Mart Stores,
Inc. v. VISA U.S.A.*, 396 F.3d 96, 121 (2d Cir. 2005).

Given this framework, Appellant respectfully suggests that rather than
simply permit A/BC to conduct a "lodestar" comparison,[10] the District Court
should have undertaken a comparison of the degree to which the *Goldberger*
factors supported the two fee applications.  NLC further respectfully submits that,
had an objective comparison been made, the *Goldberger* factors would have been

---

[10]  Appellant uses the term "lodestar" advisedly, since LC's calculations were
based simply upon "trust-me" figures.  They produced no contemporaneous time
records for a fourteen year period, and made no effort to overcome the
presumption in favor of lower "in-district" rates.

found to support NLC's application far more forcefully than the application submitted by A/BC.[11]

A. <u>The Goldberger Factors Do Not Support A/BC's Fee Request</u>

Since space is limited, we will consider only two factors –"risk of litigation," which is "'perhaps the foremost' factor to be considered," s*ee In re Agent Orange*, 818 F.2d at 232, and degree of success.

A/BC claim to have voluntarily taken "enormous" risks in this case, knowing the risks they were getting into. (A-15 Dkt #18 at 12). The truth is the opposite. There were two and only two issues concerning this litigation that were ever risky: (1) the underlying issue of liability, and (2) the issue of whether "unregistereds" could be included in the Class and damage claims pursued on their behalf.

With one exception reviewed below, A/BC did not take either risk. Appellant took both.

---

[11] This is not to suggest that this was an either-or proposition and that the Court could grant only one. To the contrary, notwithstanding that NLC believed that the equities fully supported her application, the most she ever proposed be awarded her was 30 to 38% of the limited fund. (A-20 Dkt #63 at 12). She understood that a range of awards was probably within reason and that the proposed mid-point (34 %) might not even be reached. She respectfully submits here, however, that a pay-out to her of only one-tenth that midpoint percentage is not "within the range of permissible decisions."

a.      *A/BC Did Not Assume Any Risk on the Issue of Liability*

They waited until after the Second Circuit in *Tasini* had ruled in the

freelancers' favor before beginning work on the class actions.  (See A-126:, they

began work on the class actions in October 1999; the Second Circuit decided

*Tasini* on September 24, 1999).  Also *see Reed Elsevier, Inc. v. Muchnick*, 559

U.S. 154, 158 (2009) (where the United States Supreme Court characterized the

class actions underlying this MDL as "copyright infringement suits that other

freelance authors had filed after the Court of Appeals had issued its Opinion").

When the Supreme Court subsequently granted certiorari in *Tasini*, both

*Posner* and *Authors Guild* counsel sought a stay of their own actions, pending the

Supreme Court's decision on the merits.  (A-303-305).  By the time the actions

were taken off the suspense docket, liability had already been established.  (*N.Y.*

*Times Co. v. Tasini*, 533 U.S. 483 (2001); A-88 (Statement of N.Y. Times

Counsel)).

b.      *Authors Guild and Posner Counsel Did Not Assume The Risk*
          *on the Issue of the Unregistereds*

Risk is determined *ex ante*, rather than in hindsight.  *See, e.g., McDaniel v.*

*County of Schenectady*, 595 F.3d 411, 424 (2d Cir. 2010)("[i]t is well-established

that litigation risk must be measured as of when the case is filed"); *Goldberger*,

209 F.3d at 55; *DiFillippo v. Morizio*, 759 F.2d 231, 234 (2d Cir. 1985).  At their

commencement, the *Authors Guild* and *Posner* cases limited the U.S. authors they

included in their classes to those who had registered their works with the United States Copyright Office. (A-54, A-59, A-60-61). The Complaints in those two cases did not include claims for the infringement of unregistered works. There was absolutely no risk whatsoever in such a lawsuit. *Tasini* had established liability, and the standing of "registereds" to sue for damages was clear on the face of the Copyright Act.

The team that Appellant assembled, which included Girard & Green, was the lone exception. They alone defined the Class they sought to represent as including all Freelancers whose works had been infringed, without regard to whether their works had been registered or an application for registration made. (A-56; ). Accordingly, only that team knowingly assumed the risks associated with "maintaining the litigation on behalf of unregistered authors" and "certifying" a class that included them. (*Cf.* at 12, where A/BC claim they *all* took these risks.) The team of GG and NLC knowingly undertook these risks at NLC's urging, based upon theories that she had already developed. (A-240-242).

To reiterate, at the commencement of litigation, Lead Counsel (with the exception of GG) assumed virtually no risk.

2. *Quality of Representation*: In this Circuit, the rule is that "the quality of legal representation is best measured by the result obtained." *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 55 (2d Cir. 2000). A/B Counsel have

34

characterized the result they achieved in this case as "outstanding," and their work as at all times "skillful," "diligent," "non-duplicative" and "efficient." (A-15 Dkt #18 at 13, 14, 16, 10, and 21).

There are fair grounds for debate. Since A/B Counsel neither developed the legal arguments upon which (i) classwide liability was predicated nor (ii) the Class was expanded to include the "unregistereds," the quality of A/BC's work should principally be judged by their degree of success in representing the "A/B subclass." That, after all, is the only subclass it was determined they could appropriately represent. The fruit of their labors on behalf of that group is set forth in ¶¶ 3.a and 3.b of the Settlement.

While NLC does not question the judgment that the formulas in these two subparagraphs met the requirement that they be "fair, reasonable and adequate," satisfying that threshold is one thing and qualifying as an "outstanding result" is another. Consider the following.

a. <u>Category A Compensation</u>: Category A claims, by definition, (A-468.2, ¶3.a) are those entitled to statutory damages. Ordinarily, under the Copyright Act, statutory damages range from a minimum of $750 to $30,000 per infringed work. 17 U.S.C. § 504(c)(1). Where infringement is willful, statutory damages range from $750 to $150,000 per work. 17 U.S.C. § 504(c)(2).

Here, A/BC negotiated a formula for "A" claimants that pegs pay-out to the

number of works infringed. For the first fifteen "A" works written for and

infringed by a publisher, an "A" claimant will receive $1,500 per work; for the

second fifteen, $ 1,200 per work; and after the first thirty, $875 per work.[12] (A-

468.2, ¶ 3.a). While not "inadequate," these figures can hardly be called

exceptional when one considers the statutorily-prescribed range.

      b.   <u>Category B Compensation</u>:  Here, the issue concerns a

discrepancy in treatment. A Category "B" claim is a true hybrid. Insofar as past

infringement is concerned, a Category "B" claim is indistinguishable from a

Category "C" claim. (Neither is entitled to statutory damages.) (*Cf.* A-468.2, ¶3.b

with A-468.2-468.3, ¶3.c). However, insofar as licensing and compensation going

forward are concerned, Category "B" claims <u>and</u> <u>"A"</u> claims <u>are</u> <u>indistinguishable</u>.

(*Cf.* A-468.2, ¶3.b with A-468.2, ¶3.a). In other words, both involve the licensing

_____

[12]    When one considers the further fact that the compensation formula is
bifurcated and that only sixty-five (65) % of the amount being paid
represents compensation for past infringement, the payout is actually less.
(The remaining thirty-five (35)% represents a one-time lump-sum payment
for a non-exclusive license going forward. (A-13 Dkt #8-1 at ¶¶ 4.a, 4.b). It
follows that "A" claimants" are really recovering $975, $780 and $568.75
per infringed work. $568.75 is 24% below the statutory minimum. *See* 17
U.S.C. § 504(c)(1) ("the copyright owner may elect … an award of statutory
damages … in a sum of not less than $750" per infringed work).

    Again, while this does not invalidate the Settlement, it suggests that
calling the result "outstanding" is more puffery than fact.

of already registered works. Yet, first-tier "A" claims will receive $525 per work for a future license, (A-468.2, ¶3.a; A-468.5, ¶4.a), while many "B" claims will only receive a one-time lump-sum payment of $52.50 for their continued use. (A-468.2 ¶3.b; A-468.5, ¶4.a). This means that, even though they are similarly situated with respect to future rights, a "B" claimant will only get one-tenth of what the first-tier "A" claimant gets for the continued use of their registered works.

***

In any event, even if A/BC's work had been absolutely unimpeachable,[13] the fact remains that they represent, and are thus entitled to fees as counsel for, the "A/B" subclass. That subclass comprises at most 3% of the Class. (A-514). *See also In Re Literary Works*, 654 F.3d at 246 (reporting at the time, "Category C claims comprise more than 99% of authors' total claims"). They should not, then, be entitled to 82% of the fees.[14]

They should, more appropriately, have been deemed entitled to between 3% and 57%. *At most* 57%, since Category A/B claims represent 57% of the claims

---

[13]    To be clear, the fact that Appellant has, to a degree, criticized A/BC's work does not mean they did no good work and they are not entitled to be appropriately paid. They did and they are. But they should not be able to prevent others from being fairly compensated and they should only be compensated for benefits they actually conferred. (*See* Points IV, V and VI).

[14]    Total fees amount to approximately $3.3 million, of which $2.7 have been artificially designated as "A/B" fees and $600,000 as "C" fees. (A-470, ¶9.c).

value.[15]  (The last publicly available claims-valuation figures estimated the total value of "A/B" claims at $7.08 million and "C" claims at $5.34 million, for a total claims value of $12.42 million.  (A-509, A-514-515).[16]

Even assuming, arguendo, that we credit "A/B" Counsel with the outermost of those figures (57%), *but see* footnote 15, that still means that 43% of the case's value inheres in the "C" claims and that at least 43% of the fees (effectively payable by the "C" claimants) should have gone to compensate counsel appropriately benefiting them.  "C" Counsel (formerly counsel for a group of Objectors), was tasked with representing the "C" claimants in Settlement negotiations and has been credited with increasing compensation to them "by approximately 14%."  (A-468.2, ¶3.c; A-509).  For his services, he was awarded $600,000.  (A-470 ¶9.b, A-509, A-587).  Can it really be that NLC, who developed the legal theories and arguments, in the first place, to support asserting claims for the infringement of unregistered works and including unregistereds in the class, should only have been allocated a fraction of that amount –i.e., 1/6[th] or less?  Or,

---

[15]  At most 57% because the fact that "A/B" claimants command 57% of the claims value is not attributable to anything that "A/B" Counsel have done or any benefits they have conferred, but rather to "A" claimants' status, which effectively entitles them, by definition, to statutory damages.

[16]  Total Settlement value has been estimated at $19.3 million.  In addition to claims value, it includes, e.g., the value of the attorneys' fees awarded, administrative costs, and the value attributable to Defendants' notice program. (A-509).

did the District Court abuse its discretion in authorizing such a disproportionately low allocation and the use of allocation criteria that do not comport with the law?

V.      The District Court Erred In Permitting Lead Counsel
         To Determine NLC's Allocation Based Upon A Fee-Sharing
         Agreement To Which She Was Not A Party And That Had
         <u>Not Been Timely Disclosed</u>.

Applicable Standard of Review:  De novo.

When A/BC applied for attorneys' fees in 2005, they disclosed to the District Court that, years earlier, they had entered into a fee-sharing agreement among themselves regarding the manner in which they would allocate fees.  (A-448).  A/BC referenced this fee-sharing agreement (hereinafter "F/SA") again in 2014 in their Memorandum in support of their new fee application.  (A-510-511). In the RSA, A/BC had represented that fees would be allocated "in a manner in which A/B Counsel in good faith believe reflects the contribution of … counsel to the prosecution and settlement of the Action."  (A-470 ¶9.c).  In their 2014 Memorandum, A/BC pulled a bait and switch:

> "[A]lthough paragraph 9(c) of the Revised Settlement Agreement provides that A/B Counsel will allocate fees among their associated non-lead counsel in good faith by weighing relative contributions, they do not propose to go even that far.  Instead, the allocation will be done simply in proportion to time spent on the case."

(A-511).  The formula they then described in their fee application was the one they had agreed to in their FS/A.  (A-448).  They described its mechanics as follows:

39

> The four firms serving as A/B Counsel … [will] divide the fee award into three equal shares.  One share will go to Boni & Zack LLC; another to Girard Gibbs LLP; and the third to Hosie Rice LLP and Fergus, A Law Office, collectively.

(*Id.*)  Two of the four Lead firms will then "allocate its share between itself and the firm with whom it filed its original complaint … based on their respective lodestars."  (*Id.*)  Two others were immediately exempted from the formula.  ("Hosie Rice and Fergus will divide their share according to their own agreement."  *Id.*)[17]

On June 10, 2014, A/BC handed up a proposed order at the Final Fairness Hearing that explicitly provided for the allocation formula "in A/B Counsel's fee application" to be substituted for the very different formula contained in the RSA.  (A- By signing and entering this Order (A-588, ¶4), the Court effectively made the F/SA applicable to NLC.

While on its face the formula appears to be innocuous, as the Court will see, in practice it can be anything but.  *See* Points V and VI, *post*.  When A/BC freezes one firm or attorney out of the litigation and places an indelible hold on their hours –as happened here to NLC ten years ago –and the other counsel's hours are free to rise without limit, the formula can be used as a device to redistribute fees that have

---

[17]      A third Co-Lead may also have opted out of the formula, at least with respect to the apportionment of fees between itself and its associated counsel.  (A-507, A-568).  That leaves Girard Gibbs as the one firm unquestionably applying the formula provided for by the F/SA.  Appellant is the attorney said to be "downline" to Girard Gibbs.

already been earned and recoup losses at someone else's expense.  When used in

this fashion, A/BC's F/SA formula effectively transforms counsel whose lodestar

has been frozen into an involuntary guarantor of at least a portion other counsel's

fees.  That is in effect what happened here. (*See post*).

     A.    The Court Erred In Permitting The F/SA To Be
                Applied To NLC.

The F/SA was invalid and unenforceable as against NLC for at least four

reasons:  (1) because it had not been timely or publicly disclosed to the Court as

required by the law of this Circuit, see *In re Agent Orange Product Liability*

*Litigation*, 818 F.2d 216, 226 (2d Cir. 1987)("counsel must inform the court of the

existence of a fee sharing arrangement at the time it is formulated")(emphasis

added); (2) because NLC was never a party to the agreement (A-561, A-564, A-

519);  (3) because she was not even made aware of it until several years into the

litigation, --after she had performed virtually all of the work for which she sought

compensation (A-561, A-519, A-407-408);[18] and (4) because it provided for

allocations to be determined in a manner contrary to law. (*See* Point IV, *ante*).

_____

[18]    In the nine years that the F/SA has been an issue, LC have adduced no
evidence whatsoever that NLC was ever a party to it or advised of its existence in
anything approaching a timely fashion.  Indeed, they never adduced evidence of
her having been given notice at all. The closest they came to saying NLC did have
such notice was saying the F/SA was not a secret!  (A-567-568; *But see* A-561, A-
564).

B.     By Permitting A/BC To Utilize F/SA's Allocation
       Formula To Determine How Much NLC Would Be
       Paid, The Court Violated Due Process.

In 2005, A/BC made application for fees in the approximate amount of $3.3

million.  (A-120).  As part of that application, it calculated NLC's lodestar at

$280,536 and, in effect, represented both that she had performed services having

that value and that she was entitled to be paid that amount.  (A-200-210).

Although not using as specific a figure, it made essentially the same representation

at a Court conference on November 3, 2005.  (A-449)("[b]ased on the current

hours, she is going to get paid somewhere … between 200 and $250,000, separate

from … expenses").

After that, this Court set the First Settlement aside and sent the case back for

the creation of subclass(es) and the renegotiation of an agreement.

*Literary Works in Electronic Databases Copyright Litig. v. Thomson Corp.*, 654

F.3d 242 (2d Cir. 2011).  At some point after remand, A/BC apparently concluded

that Defendants were not going to pay additional fees.  (Cf. A-120 with A-469-

470).  They also decided not to make a motion to (1) recover additional fees from

Defendants under the Copyright Act, or (2) recover a greater award out of the

common fund. See, *e.g.*, A-469-470; A-13 Dkt #8-1 at ¶11.p).  While NLC doesn't

question the propriety of either of these decisions, she questions the propriety of

the course they adopted in their stead: i.e., utilizing the redistributive powers of the

F/SA to exact payment *from NLC* for some portion of their Round 2 work. Why should they be able to look to NLC to be paid, simply because they have chosen not to look to either the Defendants or the Class? NLC was never a party to the FS/A and is not their Client.

On June 10, 2014, the District Court rendered a Decision and Order that authorized A/BC to make an allocation to NLC pursuant to the F/SA. (A-587). By so doing, it effectively sanctioned the transfer, *as of that date*, of a little over $166,000 from NLC's column on the *In re Literary Works* "ledger sheet" to Girard Gibbs'. (A-205; A-507, a-511).[19] Put another way, based upon its erroneous view of the law regarding the basis upon which allocations are to be made, the District Court authorized a 59.4%+ reduction in the amount NLC was to be paid for her MDL work –from $280,536 to at most $114,300.

---

[19]     NLC's allocation at any given time of the approximately $900,000 in fees in GG's possession is determined, under the F/SA, as follows: (1) By dividing NLC's lodestar, which LC froze at $280,356, by the total lodestar for the GG-NLC team. The latter is the sum of GG's lodestar (which, at the time, was $1,924,834.50) and NLC's lodestar of $280,536. (A-151 and A- 507). (2) GG then multiplies the resulting percentage by the one-third share of attorneys' fee it received under the F/SA. (This one-third share is approximately $900,000.) Utilizing these numbers, (a) as of June 10, 2014, NLC's allocation had been reduced from $280,536 to $114,300, and (b) $166,236 had been shifted from her to GG.

NLC's Column        Girard Gibbs' Column



$166,000 (as of June 10, 2014)

Viewed from another perspective, GG has already "billed" NLC $166,000

for performing work during Round 2 of this litigation, and the formula the District

Court approved would permit GG to bill more.   The problem is compounded by

two further factors:  at least some portion of the work for which GG is billing NLC

is work for which it could never bill its clients; and (2) it is billing her at rates

dramatically higher than the rates it used in Round 1 to bill Defendants and the

class.  *See* Point VI(c), *post*.

VI.     Even If It Were Not Improper For A/BC To Have Utilized
        A Lodestar-Comparison Formula To Determine
        NLC's Allocation, The District Court Erred In Permitting
        <u>A/BC To Use Invalid Lodestars</u>.

Standard of Review:  De novo.

Even putting aside the fact that a formula that allocates fees according

to time, rather than benefits, is contrary to law, such a formula cannot fairly,

accurately and objectively compare lodestars unless the lodestars are

properly determined.   Here, they were not properly determined.  A/BC's

hours were overstated, NLC's hours were understated and A/BC used

significantly higher hourly rates for their own lodestars than permitted under this Circuit's law.

A.    A/BC Included Hours In Their Own Lodestars
<u>That Could Not Properly Be Included</u>

Counsel's "lodestar" consists of "the number of hours reasonably billed to the class … multiplie[d] … by an appropriate hourly rate." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). In order to be reasonably billed under common fund principles, the work attorneys do must benefit the Class; simply *doing* work is not sufficient. *See* Point IV, *ante*.

It follows that at least two blocks of time (or some portion of those blocks) must be excluded from A/BC's lodestars and a third block either eliminated or significantly reduced under the peculiar circumstances of this case. These blocks can be described briefly as follows:

1.    Time Block #1: A/B Counsel's Appellate Work on the
Question Of Whether the First Settlement Was Fair,
<u>Reasonable And Adequate</u>[20]

A significant portion of LC's work during these two periods necessarily concerned the central issue on which the Objectors appealed: whether the First

---

[20]    This first time block covers at least some of LC's appellate work before the Second Circuit and two distinct periods: (i) from 11/02/2005 to December 2007 and (ii) 3/02/2010 to 8/07/2011.

Settlement was or was not fair, reasonable and adequate. The Objectors prevailed on this question and their Counsel (who became "C Counsel") billed the Class some 672.2 hours for his appellate time. (A-16 Dkt #26 at ¶¶ 3, 6). A/BC did not prevail in this phase of the proceedings.

As we have already demonstrated, hours associated with pleadings, proceedings or petitions on which a party does not prevail cannot be "reasonably billed" under the common fund doctrine. (*See* Point IV, *ante*). Logically, therefore, a significant portion of this time must be excluded.

2. Time Block #2:[21] A/B Counsel's Phase I Work Related <u>to The First Round of Mediation</u>.

The Second Circuit found a "fundamental conflict" between different groups of claimants and inadequate representation of the "C" claimants on the issue of compensation. (654 F.3d at 252-255). Notwithstanding this ruling, A/BC continue to act as though all of their Round 1 time is perfectly "billable" and can be included in their lodestar. Accordingly, they have rolled-over their 2005 lodestars into their 2014 lodestars, without deducting one second of their Round 1 time or one penny of their Round 1 lodestar. This is confirmed both in a chart and narrative in A/BC's 2014 Fee Memorandum. *See, e.g.*, A-506, where A/BC explain that the lodestars for their 2014 application were calculated by

---

[21] This second time block covers the period from 9/01/2001 to 9/27/2005.

"(i) multiplying counsel's time spent since their June 2005 fee petition by their current hourly rates <u>and</u> (ii) <u>adding the resulting fee amount to the lodestar reported in that earlier fee petition</u> …".

*Also see* Chart on A-507 (where the first line incorporates the 2005 lodestars without any alteration).  NLC respectfully suggests that it cannot be the case that A/BC could reasonably bill the class for all of their time during this Period.  It is only logical that some portion is excludable.[22]  *See generally*, *Rodriguez v. Disner,* 688 F.3d 645, 655 (9th Cir. 2012); *So v. Suchanek,*  670 F.3d 1304, 1310-11 (D.C. Cir. 2012); *Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917, 920 (2d Cir. 1950) ("Certainly by the beginning of the Seventeenth Century it had become a common-place that an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either [client], no matter how successful his labors.")

Any time that A/BC couldn't reasonably bill cannot be included in their lodestars.

---

[22]    While it is undoubtedly true that some of LC's work during Time Blocks 1 and 2 was compensable, there is no way for NLC to separate compensable from non-compensable time because LC haven't produced any contemporaneous time records.

3.    Time Block #3:[23] A/BC's Appellate Time
on the Jurisdictional Issue

NLC respectfully submits that this category is *sui generis*. It includes work

that A/BC undertook in the Court of Appeals and Supreme Court on the issue of

whether the District Court had subject matter jurisdiction over claims for the

infringement of unregistered works.

Unlike A/BC, who have assigned "zero" value to NLC's *Tasini* work and *de

minimis* value to her other work in this case, NLC has not been so uncharitable.

She does not believe that, under ordinary circumstances, A/BC would *or should* be

denied all compensation for the work they did on the jurisdictional issue. Rather,

in line with *Cendant II* and other cases, she believes that they could, under

ordinary circumstances, have reasonably billed their clients for some portion of

that time.

But, these aren't ordinary circumstances –it is NLC they are billing, not their

Clients. *See* Point V, *ante*. And, because it is NLC, none of the hours A/BC has

spent on the jurisdictional issue can be included in their lodestars. Why does NLC

take this position and make this distinction? Because including these hours in a

lodestar that is inversely tied to the amount NLC will be allocated and paid would

literally mean that NLC is being made to pay for having developed these theories

---

[23]    This third block also covers the period from December 2007 through
March 2, 2010.

and arguments in the first place. Such a notion is anathema to the principles of unjust enrichment upon which the common fund doctrine rests.

B.    A/BC Excluded Hours from NLC's Lodestar
<u>That Should Have Been Included</u>.

A/BC excluded every phase, hour and minute of NLC's *Tasini* time from her lodestar. (A-443-444). As we have already demonstrated, the exclusion was improper. *See* Point I, *ante*.

It is doubly improper because A/BC had a different rule for themselves: They included time in their own lodestars that they spent monitoring the *Tasini* case! *See*, *e.g.*, A-127, ¶ 2 (which contains the following description: "studied the Supreme Court briefing and participated in meetings with respect to amici positions in connection with the Supreme Court *Tasini* case"). They also included time they worked on cases that were, technically, "separate" lawsuits. (E.g., A-62).

C.    A/BC's Hourly Rates Were Unreasonable, Especially
<u>Under The Circumstances Of This Case.</u>

When A/BC applied for attorneys' fees in 2005, the hourly rates they used in calculating their lodestars ranged from $395/hr. to $550/hr. (A-131, A-151, A-166, A-180, A-189, A-197). When they applied for attorneys' fees in 2014, many of them utilized rates that were nearly double the earlier ones. *See, e.g.* (A-493)(showing hourly rates for the principal attorneys in the case ranging from

$650/hr. to $845/hr.) Presumably these are out-of-district rates since the attorneys with which they are associated work in other states.[24]

There are four reasons the use of significantly higher rates in 2014 was improper. First, because there is a "presumption" in this Circuit "in favor of the forum rule." *Simmons v. N.Y. City Transit Auth*., 575 F.3d 170, (2d Cir. 2009). In order to receive an attorney's fee award based on higher out-of-district rates, a litigant must overcome this presumption "by persuasively establishing that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id*. *Accord*, *McDaniel*, 595 F.3d at 420-421; *Luca v. County of Nassau*, 344 Fed. Appx. 637, 641-642 (2d Cir. 2009); *Davis v. Eastman Kodak Co*., 758 F.Supp. 2d 190, 197-198 (WDNY 2010). A/BC in this case did not even attempt to meet this burden, let alone do so. (A-478-482, A-488-505, A-442-443).

Second, their out-of-district rates are above the rates recognized as reasonable in the Southern District during the relevant period –i.e., 2005 – 2014 – for IP and copyright attorneys. *See, e.g., Broad. Music, Inc. v. PAMDH Enters*., 2014 U.S. Dist. LEXIS 84409 (S.D.N.Y. 2014)(finding that current hourly rate of $570/hr. was reasonable for copyright attorney); *Pyatt v. Raymond*, 2012 U.S. Dist. LEXIS 161713, at *6 (S.D.N.Y. May 10, 2012)(reviewing cases approving rates

---

[24]     Three out of four A/BC hail from California. The fourth has his Offices in Pennsylvania.

for partners in copyright and trademark cases ranging from $400 to $650);

*TigerCandy Arts, Inc. v. Blairson Corp.*, 2012 U.S. Dist. LEXIS 35269, at *9

(S.D.N.Y. February. 23, 2012)(Maas, Mag.)($500, not the $800 requested, was

reasonable hourly rate for IP partner who "has been practicing law for twenty-eight

years"); *Motorola, Inc. v. Abeckaser*, 2009 U.S. Dist. LEXIS 87803, 2009 WL

2568529, at *5 (E.D.N.Y. Aug. 5, 2009) (collecting Southern District cases

awarding rates of $400-$450 per hour at the time to experienced litigators);

*Microsoft Corp. v. Computer Care Ctr., Inc.*, 2008 U.S. Dist. LEXIS 112080, *43-

44 (E.D.N.Y. 2008)(reviewing rates considered reasonable in the Southern District

for copyright litigators).

Third, when A/BC petitioned for rehearing before this Court from its August

17, 2011 Opinion, they averred that if the Court adhered to that Opinion, it would

have the effect of "completely unravel[ing] a comprehensive settlement" and

"leav[e] the parties where they were at the outset of the litigation." *See* Plaintiffs-

Appellees' Petition for Panel Rehearing and Suggestion For Rehearing In Banc at

5, 13. That suggests that it would not be unfair to assume that a considerable

portion of A/BC's Round 2 work, post-8/17/2011, can objectively be characterized

as "do over" work. Several questions present themselves: Can they charge at

higher rates for re-doing work than they charged the first time round, when the

work in the initial round was found to have been deficient? Can they charge at

rates that are nearly twice as high on the do-over? Equally significantly, can they charge *both* for the initial work *and* the do-over? (See Point VI (A)(2) above). Doesn't that amount to being compensated for the same work at a combined rate that approaches 250-300% of their original rates?

Fourth, to reiterate, by the time of the remand, A/BC is not really charging either the Defendants or Class at all. They are beginning to charge NLC under A/BC's F/SA formula. The question that arises, then, is this: Assuming *arguendo* that the D.Ct. can delegate to A/BC it's power to allocate, and that A/BC could properly utilize the F/SA formula, can A/BC utilize hourly rates to determine NLC's allocation that are nearly double those that A/BC used when they were "billing" the Defendants or the Class? In other words, is it fair and meet for A/BC to charge NLC (a solo practitioner) at rates nearly double those they used when they were billing major media enterprises and publishers?

Finally, another equitable question: was it fair and meet for A/BC to further leverage their recoupment power under the F/SA formula by utilizing a significantly lower hourly rate for NLC's lodestar than they used for themselves, or should one "district or "national rate" have been used for all experienced counsel in the litigation? *See In re Agent Orange*, *supra*.

VII.   Regardless Of Whether It Was Appropriate To Use An "Hours-Worked" Or
       "Contributions-Made" Formula To Determine NLC's
       Allocation, The District Court Erred In Not Requiring Counsel To
       Produce Their Contemporaneous Time Records.

Standard of Review:  De novo.

       This Circuit has a "hard-and-fast rule" regarding the production of records in

support of an application for fees:  "A fee movant must submit contemporaneous

time records that 'specify, for each attorney, the date, the hours expended, and the

nature of the work done." *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711

F.2d 1136, 1148 (2d Cir. 1983)(" [W]e … convert our previously expressed

preference for contemporaneous time records into a mandatory requirement …

Hereafter, any attorney … who applies for court-ordered compensation in this

Circuit … must document the application with contemporaneous time records.")

Attorneys may only deviate from Carey's hard-and-fast-rule "in the rarest of

case."[25] *Scott v. City of New York*, 643 F.3d 56, 57 (2d Cir. 2011).  The District

Court may do so in even fewer cases. *Lunday v. City of Albany*, 42 F.3d 131, 134

(2d Cir. 1994)("Since all counsel ordinarily will be officers of the court, that status

cannot justify deference. The task of determining a fair fee requires a conscientious

_____

[25]   "Attorneys' fees applications that do not contain such supporting data …
'should normally be disallowed.'" *J & J Sports Prods. v. Garcia*, 2011 U.S. Dist.
LEXIS 29262, at *15 (S.D.N.Y. March 1, 2011); *Cablevision Sys. N.Y. City Corp.
v. Diaz*, 2002 U.S. Dist. LEXIS 12759, at *5 (S.D.N.Y. July 10, 2002).

and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended").

None of the circumstances that would warrant an exception to the rule exist in this case. Thus, this is not a case in which a group of attorneys applied for fees on a percentage-of-recovery theory, and a lodestar overview was only conducted as a "cross-check." *See, e.g.*, *Goldberger*, 209 F.3d at 50. Nor is this a case in which the validity or invalidity of counsel's lodestar figures were without any relevance to the issue *sub judice*. See *Rein v. Socialist People's Libyan Arab Jamahiriya*, 568 F.3d 345, 354-355 (2d Cir. 2009)(where "the court was proceeding on a different basis to which the time records were irrelevant, then there was no need to allow discovery into an irrelevant issue").

This case is the opposite. Instead of counsel making application on a percentage-of-recovery basis and calling for a "lodestar crosscheck," here A/BC did the reverse. They made application, first and foremost, on the basis of their lodestars. (A-506-508). Then they argued that "[t]he percentage-of-recovery approach confirms that … [their] fee request is reasonable." (A-508).

More significantly, there is absolutely no way that the validity or invalidity of A/BC's lodestars in this case could be "irrelevant" to the issue at hand. To the contrary, A/BC sought and obtained authority from the Court in this case to utilize a formula that would determine NLC's allocation and pay-out based upon a

comparison of her "lodestar" to the lodestar of Girard Gibbs. For every unit GG's lodestar increases, NLC will be paid less. Conversely, if their lodestar is found to include hours it shouldn't include -as NLC respectfully submits is the case here, *see* Point VI (A) *ante* –then NLC's allocation increases. In other words, under the formula that A/BC adopted and the District Court authorized A/BC to use, the pay-outs of NLC and GG are inversely proportional to one another.

Significantly, time records are relevant no matter which of the three methodologies for allocating fees this Court determines to be appropriate. If it concludes that a "contributions-made" analysis is appropriate, contemporaneous time records will reveal counsel's respective contributions. If it determines that a broadly-based "hours-worked" formula is appropriate, contemporaneous time records will reveal whether or not hours have been properly included in a lodestar. And, if a formula of the type contained in the Fee-Sharing Agreement is appropriate, contemporaneous time records perform the same function they perform in the more broadly-based "hours worked" formula. The difference is that, under the FS/A, only one set of time records would relevant: GG's.

By denying NLC access to AB/C's contemporaneous records and failing to require A/BC to produce them, the District Court deprived NLC of a fair allocation process and due process of law. *See In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig*., 982 F.2d 603, 611-615 (1st Cir. 1992).

VIII.     The District Court Erred In Overruling The Preceding Objections On
          That Ground That NLC Lacked Standing To Make Them.

Standard of Review: De novo.

        The District Court never reached the merits of many of NLC's objections

because it accepted A/BC's contention that NLC lacked standing to make them.

(E.g., A-575).

        The District Court's ruling was in error for at least five reasons.  First, NLC

clearly had Article III standing to object to A/BC's hours, rates and lodestars and

to their failure to produce contemporaneous time records.   She also had standing

to object to the character of A/BC's allocation formula, the imposition of its

undisclosed fee-sharing agreement, and the District Court's unlawful delegation of

authority.

        After all, it was by these means –both singly and in combination --that she

suffered an injury-in-fact, i.e., "a concrete and particularized, actual or imminent

invasion of a legally-protected interest." *See generally Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 559-561 (1992).  The amount she expected to be allocated

and paid thereby became inversely proportional to the number of hours GG had

included in its lodestars, the propriety of its rates, and the propriety of the manner

in which they had calculated NLC's lodestar.  It also became strictly dependent on

'time spent' rather than on the benefits NLC had conferred.  Even more concretely,

perhaps, she suffered the imminent transfer of at least $166,000 from her side of the *In re Literary Works ledger* sheet to other counsel's. (*See* Point V, *ante*).

Her injuries-in-fact are fairly traceable to the allocation methodology and hourly rates A/BC adopted and the "trust me" lodestar figures it computed. Those injuries were and continue to be redressable by a favorable Court decision.

In addition to Article III standing, NLC also had standing as a matter of due process and equal protection. *See generally*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (noting that an asserted deprivation of a procedural right affecting concrete interests suffices for standing); *In re Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 611-615 (1st Cir. 1992). In the latter regard, it should be noted that, both in 2005 and 2014, AB/C "opposed" NLC's fee motion. The District Court cannot, on the one hand, permit them to "oppose," but deny NLC a countervailing right.

Fourth, NLC even had standing under Fed.R.Civ.P. 23(h). The Rule provides that "a class member, or a party from whom payment is sought, may object to … [class counsel's fee] motion." Fed.R.Civ.P. 23(h)(2). She respectfully submits that under A/BC's allocation formula, she qualified as a party "from whom payment … [wa]s sought." *See generally*, *Devlin v. Scardelletti,* 536 U.S. 1, 10 (2002)("[t]he label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules").

Fifth and finally, the District Court expressly ruled to the contrary on the standing issue in 2005.  At that point, the District Court believed it was "obvious" that NLC had standing. *See* A-101 ¶48, lines 21-25 ("And obviously, Ms. Bass or Ms. [S]hatzkin on her behalf can have whatever independent opportunity that they wish to object as any one else, any class member would object to the settlement, if you wish to object to the distribution of the attorney's fees").

A Final Note:  The reason an "abuse of discretion" standard generally applies on appeal of an order awarding attorneys' fees is that the District Court is considered to be "intimately familiar with the nuances of the case" and, therefore, "in a far better position to make … decisions than is an appellate court, which must work from a cold record." *McDaniel*, supra, 595 F.2d at 416. The circumstances here are the opposite. This Court is as familiar, if not more familiar with the nuances of this case and the record in this case, than is the Court below.  This is not intended in any way as an indictment of the District Court, but simply as recognition of the fact that, in principal part, the life of this case has been split between private mediation and appellate courts.  It has not lingered long in between.  Accordingly, this Court is as suited as the District Court to make an allocation determination in this case if it concludes that it should be made on a "contributions-made" basis.  If it concludes that it should be made on some form of "hours-worked" basis, on the other hand, NLC would not expect this Court to wade

into that level of detail. In that event, NLC would respectfully seek reversal and remand for determinations to be made by a United States Magistrate.

CONCLUSION

For the reasons stated, NLC respectfully requests that so much of the District Court's June 10, 2014 Order be reversed as pertains to the allocation of attorneys' fees and that such other proceedings be had in this matter as are directed by this Court.

Dated:    New York, New York
           October 22, 2014

                    Respectfully submitted,

                    Emily M. Bass (EB-28888)
                    Law Offices of Emily Bass
                    551 Fifth Avenue, 28th Floor
                    New York, N.Y. 10176
                    (212) 260-3645
                    emilybassesq@gmail.com

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      I certify that this brief complies with the type-volume limitation of

Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 13,968 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of

Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6)

because:

    This brief has been prepared in proportionally spaced typeface using Microsoft Word 97-2003, in Times New Roman, font size 14.

Dated:      New York, New York
           Dated: October 22, 2014

Special Appendix

**i**

# Table of Contents
## (Special Appendix)

**Page**

Order of Honorable George B. Daniels, Granting Motion of Category C Claims Counsel for Award of Attorneys' Fees, Dated June 10, 2014 ................................................................SPA-1

Order Appealed From:  Order of Honorable George B. Daniels, Granting A/B Counsel's Application for Award of Attorneys' Fees and Reimbursement of Costs, Dated June 10, 2014 .........SPA-2

**SPA-1**

Case 1:00-md-01379-GBD   Document 48   Filed 06/10/14   Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
                                    )
IN RE LITERARY WORKS IN ELECTRONIC  )    MDL No. 1379
DATABASES COPYRIGHT LITIGATION      )
                                    )
```

**ORDER GRANTING MOTION OF CATEGORY C CLAIMS COUNSEL
FOR AWARD OF ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

This matter is before the Court pursuant to the Motion of Category C Claims Counsel for

Award of Attorneys' Fees, Costs and Incentive Awards. Having read and considered Category C

Claims Counsel's fee application and supporting papers, and having held a hearing on Category

C Claims Counsel's fee application, it is hereby

ORDERED as follows:

1.    The sum of $600,000 is hereby approved and awarded to C Counsel, to be applied

to (i) his attorneys' fees and reasonable costs; and (ii) special awards to the two C Plaintiffs and

eight Former Objectors.

2.    Category C Claims Counsel shall be paid on the date and in the manner set forth

in the Revised Settlement Agreement.

DATED this _____ day of _____, 2014.

**JUN 10 2014**

_George B. Daniels_
The Honorable George B. Daniels
United States District Judge

**SPA-2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
                                    )
IN RE LITERARY WORKS IN ELECTRONIC  )      MDL No. 1379
DATABASES COPYRIGHT LITIGATION      )
                                    )
```

### ORDER GRANTING A/B COUNSEL'S APPLICATION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS, AND SERVICE AWARDS TO A/B PLAINTIFFS

This matter is before the Court pursuant to the motion of plaintiffs in the above-captioned action ("Action") for an award of attorneys' fees and reimbursement of costs and service awards to A/B Plaintiffs. Having read and considered A/B Counsel's fee application and supporting papers, and the objections thereto, and having held a hearing on A/B Counsel's fee application, it is hereby

ORDERED as follows:

1.   The objections are hereby overruled;

2.   Attorneys' fees and reimbursement of expenses to A/B Counsel in the total amount of $3,306,209.76 are hereby approved and awarded. Special awards to the nineteen A/B Representative Plaintiffs and the estates of deceased former Representative Plaintiffs Derrick Bell and Andrea Dworkin, in the amount of $2,000 each, are hereby approved and awarded;

3.   A/B Counsel shall be paid on the date and in the manner set forth in the Revised Settlement Agreement.

4.   A/B Counsel shall allocate plaintiffs' attorneys' fees in the manner set forth in A/B Counsel's fee application.

DATED this _____ day of JUN 10 2014 ___ _____, 2014.

_George B. Daniels_
The Honorable George B. Daniels
United States District Judge